```
             IN THE UNITED STATES DISTRICT COURT
            FOR THE WESTERN DISTRICT OF TENNESSEE
                       WESTERN DIVISION
_____

JANETTE BLACKSHEAR,            )
                               )
     Plaintiff,                )
                               )
v.                             )      No. 03-2535 Ma
                               )
SHELBY COUNTY HEALTH CARE      )
CORPORATIONS d/b/a THE         )
REGIONAL MEDICAL CENTER        )
AT MEMPHIS,                    )
                               )
     Defendant.                )
_____

   ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR
                        SUMMARY JUDGMENT
_____
```

Plaintiff Janette Blackshear ("Blackshear") brings this action under 42 U.S.C. § 1983, the Tennessee Whistleblower Act (Tennessee Code Annotated § 50-1-304(a)), and Tennessee common law, alleging, in part, that Defendant Shelby County Health Care Corporation ("The Med") terminated her employment in violation of her constitutional rights.  On September 30, 2005, The Med filed a motion for summary judgment, to which Blackshear responded on December 16, 2005. The Defendant replied on February 13, 2006.

**I. Background**

The following facts are undisputed unless otherwise noted. Blackshear began working as a trauma nurse at The Med in June, 1998. (Compl. at ¶ 1.) On January 25, 2002, Blackshear began a

twenty-four hour shift with her partner, Michelle Ashburn ("Ashburn"). (Compl. at ¶ 10.) During the first part of their shift, as the two nurses were sleeping in a break room, two ophthalmology residents asked Ashburn to help them. (Compl. at ¶ 12.) Ashburn left with the residents, and nurse Veronica Castillo asked Blackshear "do you know how to get up to Chandler [an operating room] or through the back elevator." (Compl. at ¶¶ 12-13.) Blackshear responded that she didn't know the code but that Castillo could call Jerry and find out. (Compl. at ¶ 13.) Blackshear went back to sleep. (Id.)

Ashburn and Blackshear replaced Castillo and her partner in a procedure later that morning. (Compl. at ¶ 14.) When Blackshear and Ashburn arrived, one of the ophthalmology residents was filling out a formal complaint about Castillo's performance. (Compl. at ¶ 15.) Management claims that this complaint was never received. (Compl. at ¶ 16.)

A few days later, Blackshear's supervisor, Linda Duncan, called Blackshear at home to ask her about her role in the ophthalmology resident's complaint. (Compl. at ¶ 18.) Duncan said that she understood Castillo had asked several times for Blackshear's help in locating a microscope and that Blackshear had repeatedly refused to assist her. (Id.) Blackshear stated that she knew nothing about a microscope. (Id.) Duncan wrote up both Ashburn and Blackshear for refusing to help locate the microscope and

2

placed both nurses on probation for a twelve-hour shift. (Id.) Duncan later placed Blackshear on suspension for the incident. (Id.)

On January 30, 2002, Blackshear attended a thirty-minute disciplinary hearing about the microscope incident. (Compl. at ¶ 19.) Although Blackshear repeatedly insisted that Castillo had never asked her to locate a microscope, Duncan presented her with a "final warning" notice. (Id.) Blackshear refused to sign it. (Id.) A week later, one of the ophthalmology residents told Blackshear that she had informed two people in management that Castillo, not Blackshear and Ashburn, had been the problem on January 25, 2002. (Compl. at ¶ 20.) Ashburn and Blackshear filed timely grievances on February 13, 2002. (Compl. at ¶ 21.) Hearings were postponed for two months, and Ashburn's took place on May 7, 2002. (Compl. at ¶¶ 25-26.) The two ophthalmology residents testified at Ashburn's hearing that neither Blackshear nor Ashburn was responsible for the incident with the microscope. (Compl. at ¶ 26.) Ashburn's final warning was reduced to a first reprimand as a result of her hearing. (Id.)

On June 2, 2002, Blackshear organized a meeting to promote a nurse's union at The Med. (Compl. at ¶ 30.) Both the nurses and management knew that Blackshear was leading an organizing drive for a union. (Compl. at ¶ 29.)

On July 9, 2002, Linda Pulley, the patient care coordinator,

3

Castillo, and Duncan appeared for the hospital at Blackshear's grievance hearing about the microscope incident. (Compl. at ¶ 31.) A medical student alleged that he was present during the incident and saw Blackshear and Ashburn behaving unprofessionally. His statement had not been introduced at Ashburn's hearing. (Id.) Blackshear alleges that the student's name did not appear on the patient's chart until six months after the incident took place, and that it would have been highly unusual for a student to have participated in the operation.(Id.) The Med disputes these allegations. Also in dispute is Blackshear's allegation that a statement taken on September 26, 2002, certifies that no medical student was present during the incident. (Id.)

Blackshear's final warning was not reduced to a first reprimand, as Ashburn's had been. (Id.) Blackshear filed a formal complaint against the medical student with his medical school, the University of Tennessee. (Compl. at ¶ 33.) On July 12, 2002, Duncan asked Blackshear if she had made the complaint. (Compl. at ¶ 34.) Blackshear said that she had not, but admitted that a complaint had been made with her approval, and Duncan suspended her for a day. (Id.) After two more informal meetings about the complaint against the student, during which Blackshear continued to deny making the complaint, she was terminated. (Compl. at ¶¶ 35-37.)

The following facts are in dispute. Blackshear alleges that her union activities during the months before her grievance hearing

4

were the cause of her termination. She points to the fact that Ashburn, who was not a union organizer, received a first-time reprimand, but Blackshear received a final warning. Further, Castillo, who opposed the union, received no discipline, although the ophthalmology residents blamed her for the incident. Blackshear alleges that her final warning and her ultimate termination were motivated by her union activity.

## II. Jurisdiction

Because this case arises under federal law, the court has jurisdiction under 28 U.S.C. § 1331. The court exercises jurisdiction over related state law claims under 28 U.S.C. § 1367(a).

## III. Summary Judgment Standard

The party moving for summary judgment "bears the burden of clearly and convincingly establishing the nonexistence of any genuine issue of material fact, and the evidence as well as all inferences drawn therefrom must be read in a light most favorable to the party opposing the motion." Kochins v. Linden-Alimak, Inc., 799 F.2d 1128, 1133 (6th Cir. 1986). The moving party can meet this burden by pointing out to the court that the respondents, having had sufficient opportunity for discovery, have no evidence to support an essential element of their case. See Street v. J.C. Bradford & Co., 886 F.2d 1472, 1479 (6th Cir. 1989).

When confronted with a properly supported motion for summary

judgment, the nonmoving party must set forth specific facts showing that there is a genuine issue for trial. A genuine issue for trial exists if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). The party opposing the motion must "do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). The nonmoving party may not oppose a properly supported summary judgment motion by mere reliance on the pleadings. See Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986). Instead, the nonmoving party must present "concrete evidence supporting its claims." Cloverdale Equip. Co. v. Simon Aerials, Inc., 869 F.2d 934, 937 (6th Cir. 1989). The district court does not have the duty to search the record for such evidence. See InterRoyal Corp. v. Sponseller, 889 F.2d 108, 110-11 (6th Cir. 1989). Nonmovants have the duty to point out specific evidence in the record that would be sufficient to justify a jury decision in their favor. See id.

**IV. Analysis**

    **A. Blackshear's § 1983 Claim**

Blackshear alleges that The Med terminated her in retaliation for her union activities. To establish a prima facie claim of retaliation under 42 U.S.C. § 1983, a plaintiff show that: (1) she engaged in constitutionally protected activity; (2) that the

6

defendant's adverse action caused the plaintiff to suffer an injury that would likely chill a person of ordinary firmness from continuing to engage in that activity ; and (3) the adverse action was motivated in part by the plaintiff's constitutionally protected conduct. Mezibov v. Allen, 411 F.3d 712, 717 (6th Cir. 2005); Mattox v. City of Forest Park, 183 F.3d 515,520 (6th Cir. 1999). Once the plaintiff has met her burden of establishing that her protected conduct was a motivating factor behind any harm, the burden of production shifts to the defendant. Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977). If the defendant can show that it would have taken the same action absent the protected activity, the defendant is entitled to prevail on summary judgment.

For purposes of this motion, The Med has conceded that union activity is a constitutionally protected activity. Therefore, the Plaintiff has established the first element of a cognizable retaliation claim. (Mtn. for Summ. J. at 12.)  The Med also does not dispute that its disciplinary actions and Blackshear's discharge satisfy the second element of a cognizable retaliation claim.  The only remaining issue is whether the facts support the conclusion that the disciplinary actions and ultimate discharge were motivated in part by Blackshear's union activity.

Blackshear argues that both she and Ashburn were accused of the same infraction and given almost identical "Corrective Action"

7

reports. Because Ashburn's final warning was reduced to a first reprimand after the grievance hearing, Blackshear argues that The Med's failure to reduce her final warning was motivated by her union activity. (Resp. to Mtn. for Summ. J. at 5-6.)

The Med argues that the differing outcomes were a result of case presentation and not retaliation. The Med contends that Ashburn and Blackshear are not similarly-situated. (Mtn for Summ. J. at 8.). The Med notes that Blackshear and Ashburn chose different advocates to present their cases; Ashburn presented witnesses at her grievance hearing and Blackshear did not; and the grievance committees[1] for Ashburn and Blackshear were comprised of different people. (Id.)

The Sixth Circuit has held that, to qualify as "similarly situated" in the disciplinary context, the plaintiff and the colleagues to whom she seeks to compare herself "must have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." Mitchell v. Toledo Hospital, 964 F.2d at 583. The Sixth Circuit has also stated that, in applying this standard, courts should not demand exact correlation, but should instead seek relevant similarity.

---

[1] A grievance committee consists of four members and one chairperson. The employee chooses two members from a list of eligible members and management selects two members.

Ercegovich v. Goodyear Tire & Rubber Co., 154 F.3d 344, 352 (6th Cir.1998).

The Med's argument about the differences in the grievance hearings ignores the reason for the hearings.  The facts on which The Med based its final warnings to Ashburn and Blackshear are the same in all relevant respects. Blackshear and Ashburn were trauma nurses working as partners.  They had the same supervisor, were charged with almost identical offenses arising from the same alleged conduct, and filed their appeals at the same time. Thus, the undisputed facts establish that Ashburn and Blackshear are similarly situated.

Blackshear alleges that The Med offered a statement by a medical student to the effect that he had witnessed Ashburn and Blackshear behaving unprofessionally. Blackshear alleges that this statement was not introduced as Ashburn's hearing and that there is evidence that the statement was a fabrication:

    Q. Is it your contention that he wasn't there?
    A. Exactly.
    Q. And why do you say that?
    A. He was never seen.  He was nowhere.  Sheron Richardson never seen him. Joel Inman never seen him.  Joel Inman was in that room from one o'clock until seven o'clock until we came in.  This medical student was never in that room.  Nobody ever seen him in that department. (Blackshear's Deposition, pg 101, lines 2-12.)

After her grievance hearing, Blackshear called the medical student's school to file a formal complaint against him.  When

9

asked why she called the school, Blackshear responded that "[he] had filled out a statement about me that presented at my grievance that wasn't true." (Blackshear's Deposition, pg 113, lines 22-25.) Blackshear also argues that, unlike Ashburn's, her hearing occurred after she started participating in union activity and after management became aware of her activities. (Resp. to Mtn. for Summ. J. at 7.)

A reasonable jury could conclude that Blackshear's disciplinary action and discharge were motivated in substantial part by her union activity. Therefore, Blackshear has established a prima facie claim of retaliation under section 1983.

Because Blackshear has established the elements of her claim, the burden shifts to The Med. The Med cites its employment manual and argues that it followed the grievance plan detailed in the manual. (Mtn for Summ. J. at 16.)  The Med argues again that Ashburn's choice of a different advocate and presentation of witnesses at her grievance hearing caused the disparate outcomes. (Mtn for Summ. J. at 8.) None of The Med's arguments provides a nondiscriminatory reason for the selective introduction of the medical student's statement at Blackshear's hearing and not at Ashburn's.  The Med's argument has no application to Blackshear's allegation that The Med fabricated the statement of the medical student to use against her or that The Med terminated her based in part on her union activities.

10

There are disputed material facts about whether The Med fabricated the medical student's statement against Blackshear and whether The Med was motivated in part by Blackshear's union activities when she was discharged. There are also disputed material facts about why Blackshear and Ashburn, although similarly situated, were treated differently. The Med's motion for summary judgment on the section 1983 claim is DENIED.

**B. Blackshear's State Retaliatory Discharge Claim**

Blackshear bases her state claim for retaliatory discharge on her alleged "unlawful termination for participation in union activities". (Resp. to Mtn. for Summ. J at 10.) Based on her complaint, it is not clear whether Blackshear's claim is based on Tennessee common or statutory law, and she does not address the legal basis for her claim in her response to The Med's motion for summary judgment.

The Tennessee Whistleblower Act provides that " [n]o employee shall be discharged or terminated *solely* for refusing to participate in, or for refusing to remain silent about, illegal activities." Tenn. Code Ann. § 50-1-304(a). Illegal activities are defined as "activities which are in violation of the criminal or civil code of this state or the United States or any regulation intended to protect the public health, safety or welfare." Tenn. Code Ann. § 50-1-304(c).

Under Tennessee common law, to be liable for retaliatory

11

discharge, the plaintiff must show that the motivating factor for her discharge violates a clear public policy. "Usually this policy will be evidenced by an unambiguous constitutional, statutory or regulatory provision." <u>Chism v. Mid-South Milling Co.,</u> 762 S.W.2d 552, 556 (Tenn.1988).

Blackshear fails to meet her burden under both statutory and common law.  She alleges that The Med discharged her in retaliation for filing a charge with the National Labor Relations Board ("NLRB") alerting it to The Med's alleged illegal treatment of her based on her union activities.   (Resp. to Mtn. for Summ. J. at 10).  The Med argues that Blackshear's claim is without merit because it discharged her on the same day that the NLRB mailed the letter advising The Med of Blackshear's charge.  (Supp. Mtn. for Summ. K. at 10.)

 The Med submits an "Affidavit of Service of Charge Against Employer," which states that notice of charge was mailed on July 23, 2002  (Exhibit Y, Supp. Mtn. for Summary J.) and that the letter sent by Linda Duncan terminating Blackshear's appointment, was also mailed on July 23, 2002. (Exhibit K, Mtn. for Summ J.) Thus, The Med argues that it discharged Blackshear before it learned of her charge with the NLRB.

Because the letter informing The Med of Blackshear's NLRB charge was mailed on the same day as the letter discharging her, a reasonable jury could not conclude that The Med had any knowledge of Blackshear's charge.

12

Blackshear has not offered any evidence establishing that The Med knew of her charge with the NLRB or that The Med retaliated against her for filing that charge. Therefore, The Med's motion for summary judgment on the state law retaliatory discharge claims is GRANTED.

**C. Blackshear's Claim for Negligent Infliction of Emotional Distress**

To establish a prima facie case for negligent infliction of emotional distress, a plaintiff must present material evidence as to each of the five elements of general negligence--duty, breach of duty, injury or loss, causation in fact, and proximate or legal cause. See e.g., Camper v. Minor, 915 S.W. 2d 437, 446 (Tenn. 1996); Kilpatrick v. Bryant, 868 S.W.2d 594, 598 (Tenn.1993); Bradshaw v. Daniel, 854 S.W.2d 865, 869 (Tenn.1993).

Blackshear contends that she has established the elements necessary for a negligent infliction of emotional distress claim by establishing the necessary elements in her claim for retaliatory discharge.(Resp. to Mtn. for Summ. J. at 11.)

Even if that were true, as the court has already noted, Blackshear has failed to establish a claim for retaliatory discharge. Blackshear has not presented any facts to establish the duty The Med is alleged to have owed her, how it breached that duty, or how it caused her injury.

Because Blackshear has not established a prima facie claim for

13

negligent infliction of emotional distress, The Med's motion for summary judgment on this claim is GRANTED.

**D. Intentional Infliction of Emotional Distress**

Under Tennessee law, there are three essential elements of a cause of action for intentional infliction of emotional distress: (1) the conduct complained of must be intentional or reckless; (2) the conduct must be so outrageous that it is not tolerated by civilized society; and (3) the conduct complained of must result in serious mental injury. See e.g., Johnson v. Woman's Hospital, 527 S.W.2d 133, 144 (Tenn.App.1975).

A perfect legal standard does not exist for determining whether conduct is so intolerable as to be tortious. The Tennessee Supreme Court has adopted and applied the high threshold standard described in the Restatement (Second) of Torts as follows:

> The cases thus far decided have found liability only where the defendant's conduct has been extreme and outrageous. It has not been enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by 'malice,' or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort. Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community. Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, 'Outrageous.'

Medlin v. Allied Inv. Co., 217 Tenn. 469, 479, 398 S.W.2d 270, 274 (1966) quoting, Restatement (Second) of Torts §§ 46 comment d (1965).

Blackshear's response does not discuss the elements necessary

to establish a claim for intentional infliction of emotional distress. Blackshear contends that this claim was established by the facts alleged in her claim for retaliatory discharge. (Resp. to Mtn. for Summ. J at 10.)

None of the factual allegations contained in Blackshear's complaint supports a finding of intentional infliction of emotional distress. Because Blackshear has not alleged facts of such an outrageous character as to give rise to a claim for intentional infliction of emotional distress, The Med's motion for summary judgment on this claim is GRANTED.

**V. Conclusion**

For the foregoing reasons, The Med's motion for summary judgment on Blackshear's claim under 42 U.S.C. § 1983 is DENIED. The Med's motion for summary judgment on Blackshear's state retaliatory discharge claims and negligent and intentional infliction of emotional distress claims is GRANTED.

So ordered this 8th day of March 2006,

                                                      _____
                                                      s/ Samuel H. Mays, Jr.
                                                      United States District Judge